### FISHER v. ELAM. *
### No. 4162.

Court of Appeal of Louisiana. Second Circuit. Dec. 9, 1931.

*Rehearing denied January 14, 1932.

Argued before DREW, McGREGOR, and TALIAFERRO, JJ.

Jas. W. Jones, Jr., of Natchitoches, and Julius T. Long, of Shreveport, for appellant.

Barnette & Roberts, of Shreveport, for appellee.

DREW, J.

Plaintiff instituted this suit for damages alleged to have been caused her in an automobile accident, alleging that her car was run into by the car of defendant which was driven by defendant's minor son.

The defense to the suit is a denial that defendant's car ran into or struck the car of plaintiff.

The case evolves into a question of fact, and the only question to determine is: Did defendant's car strike plaintiff's car? If it did, defendant is liable; otherwise not. The learned judge of the lower court in a well-written opinion held that plaintiff failed to prove that her car was struck by defendant's car, and rejected her demands. The opinion of the lower court is as follows:

"Plaintiff was driving her Chevrolet Sedan south on the Natchitoches-Leesville Highway, and when she arrived at a point about one-half mile north of Provencal, she had a wreck, her car swerving in loose gravel, and partially going into a ditch, hitting a stump and injuring her severely and permanently.

"It is claimed that she was struck by a Dodge Coupe, going north, driven by J. B. Elam, Jr., in which C. B. Huson and Willis Johnson were riding with the driver.

"It is not denied that the Dodge so occupied was in that immediate neighborhood at about the time of the wreck.

"The plaintiff testified that she was struck by a Dodge Coupe occupied by three men; the three occupants of the Dodge denying that they struck plaintiff's car, or came anywhere near doing so; that they remember meeting a Chevrolet driven by a lady about a mile or so away from the scene of the wreck, but did not strike her.

"The evidence in behalf of plaintiff is purely circumstantial. Besides herself, there were two eye-witnesses to the wreck, a Mrs. Bell and her sister, Miss Dowden, both of whom testified on behalf of plaintiff. The accident happened 565 yards from a small bridge in front of the Hawthorne home, the road from there to the scene of the wreck being straight, and being straight beyond that point for a distance of 150 or 200 yards. Mrs. Bell and her sister were in the yard of the Hawthorne home preparing to get in their truck when they saw a coupe going north and occupied by three men, traveling at an ordinary rate of speed, estimated at 35 or 40 miles per hour. They then got into the truck, started the motor, and drove out to the road. When they reached the little bridge, they saw plaintiff's car just as it turned around and headed into the ditch. Mrs. Dowden said that it had been about five minutes since she had seen the coupe pass. We hardly think it had been anything like that long, but it certainly took some appreciable time to get in the truck, settle themselves, start the motor, and drive the truck, changing gears, out to the road. Miss Dowden testified that while she saw plaintiff going into the ditch, she did not see any other car at that time. Mrs. Bell was not asked this question. This testimony would have a very strong tendency toward showing that plaintiff's car was not struck by any other car at all. Of course, if anything like five minutes elapsed between the time these parties saw the coupe pass and the time they saw the accident occur, then the coupe would have been at least three or four miles away at the time of the accident, for they say the coupe was going 35 or 40 miles per hour. If the coupe was going 40 miles per hour, then it took 28 seconds for it to go from the Hawthorne home to the place of accident and at least 36 seconds to pass beyond the curve; it took 8 seconds to go from place of accident to the curve. If it took the coupe 8 seconds to make 450 feet at 40 miles per hour (and it was out of sight at the time of the accident), then the Chevrolet traveled at an average speed of only three miles per hour from the time it started on its skidding course, for it went 35 feet. Of course, such a slow speed was impossible. It is not at all likely that such a small fraction of time as 36 seconds elapsed from the time these parties started to get into their truck until they reached the bridge. If more than that time elapsed, the accident could not have been caused by the car they saw pass. If they reached the bridge within that time, the coupe is bound to have been in sight, yet Miss Dowden saw no car. If the car was in sight, and she did not see it, then her power of observation was not very keen and her testimony that no other car passed (while given truthfully) is not entitled to much weight.

"If the Chevrolet was struck by another car, the only place it was hit was on the hub cap of the left rear wheel; the broken hub cap was found at the supposed place of collision. No passing car could have side-swiped the Chevrolet without leaving some other marks on both the Chevrolet and the other car, yet none were found. If a car had passed exactly in the manner indicated by the tracks, it is possible for the left end of the rear bumper to have struck only the hub cap. But there is only one part of the bumper which would have made the particular in-

dentation found in the hub cap, and that is the round head of a bolt running through the bumper from top to bottom, this bolt having either a hexagonal or octagonal nut on the other end. The hub cap was not struck by such a nut. The testimony shows that if the round head of the bolt was on the bottom part of the bumper, it might have struck the hub cap and left such a mark, but the testimony shows that the round head of the bolt on the Elam car was on top (and we have no right to disregard such testimony) and we do not see how it was humanly possible for this bolt head on the Elam car to have left such a mark on the hub cap. The spring action might permit such if the round head was on the bottom; but with the round head on top, the axle-housing would prevent the springs from compressing enough to allow the top of the bumper to hit the hub cap.

"The Elam car admittedly stopped at a filling station in Provencal, and we have the testimony of quite a number of men there that no other car went north from the time it left until the accident was reported. This is not absolutely convincing at all. Mr. Dwyer is one of those who so testified, yet Mr. Babbitt who went to Provencal with Mr. Dwyer and was with him when he saw the Elam car, testified that he did not see the Elam car. Mr. Dwyer in his testimony given at Natchitoches, stated that Mrs. Bell (p. 96), said (to him), 'that a big car passed them up on the hill, and by the time that Mrs. Bell got to the top of the hill, she saw Mrs. Fisher's car swerve.' And again on page 100, he testified:

"'Q. Was there any other car that went down that way before Mrs. Bell came up? A. No, sir. Mrs. Bell's truck was the only one that left there from where we were, and a minute or two afterwards the big car left, headed out from the filling station and I saw it. They evidently passed Mrs. Bell's car around the curve out of my sight, going up the hill, the Dodge coupe did.'

"The above is not in accord with the testimony given by Mrs. Bell.

"Mr. Dwyer likewise testified in regard to a statement made by Mrs. Fisher as she regained consciousness while being moved from her car. Mrs. Fisher says she was unconscious until after she reached Natchitoches, and many others were in just as good a position to hear what she said (if anything) and yet none of them so testify.

"We do not attach much weight to the testimony of Lawrence Fox as to the car traveling a back way from Robeline. We have no reason to doubt that he saw a car so going, but we do doubt his identification. He says, on page 62:

"'A. Mr. Key of Provencal telephoned me to head off a Dodge car at Robeline * * * I went out to head the car off and the car went through the back street, did not come up the main highway and I missed the car I reckon two minutes.

"'Q. Did you see the car? A. Yes, sir.

"'Q. What kind of car was it? A. A Dodge.

"'Q. Dodge what? A. Coupe.'

"And on page 63:

"'A. About a minute, just as quick as I left the telephone, I started to the railroad track, as it was going out the back street, and I seen the car, *just seen the dust*, got a view of a Dodge car, *new* car, * * * and.'

"And on page 66:

"'Q. What color was it? A. To tell you the truth I just got a glimpse of it, it was going so fast, I recognized it as a *new* Dodge car.'

"Defendant's car was not a new car.

"'Q. How far were you from it when you saw it? A. One hundred and fifty yards.

"'Q. Traveling so fast that you could not tell the color of it? A. Yes, sir, was driving and the dust was thick, mighty near all over the car, could not hardly tell what kind of a car it was.'

"Under such conditions we think the witness called on his imagination (perhaps unconsciously) to determine the make of the car.

"The plaintiff in this case was undoubtedly badly hurt, and there are very grave suspicions pointing to the Elam car as the cause of the accident, but we do not consider same strong enough to fix the liability on it.

"The demands of plaintiff are rejected."

We find no manifest error in the judgment of the lower court. The evidence of all of defendant's witnesses, as well as the evidence of the plaintiff, is that her car and defendant's car passed one another not less than one mile and probably two miles from Provencal, and her car was wrecked only about one-half mile from Provencal at a point where it is shown that there was from twelve to fourteen inches of loose gravel on the road. We are of the opinion that the testimony in the case clearly proves that plaintiff's car was not struck by defendant's car and it would strain the imagination in utter disregard of the testimony to hold otherwise. The time defendant's car left Provencal until the time of the accident, according to plaintiff's witnesses, makes it impossible for defendant's car to have been at the place of the accident at the time it occurred. There is certainly no manifest error in the judgment of the lower court.

It is therefore ordered, adjudged, and decreed that the judgment of the lower court be affirmed, with all costs.

McGREGOR, J. (dissenting).

The finding of the majority opinion in this case is so different from my estimate of the evidence I find myself compelled to dissent. I shall endeavor to state my reasons as briefly and concisely as possible.

Two outstanding facts of the case are admitted by all, viz.: (1) The plaintiff was seriously injured, and (2) the cause of her injury must have been a collision with an automobile going in the opposite direction from that in which she was traveling.

The written opinion of the lower court, which was adopted and made the opinion of the majority of this court, states the fact of the accident correctly. On June 20, 1930, the plaintiff, Mrs. Hazel Booth Fisher, was on her way to visit her sister in the town of De Quincy, this state. She had left her home in Shreveport and was riding in and driving a Chevrolet sedan, with her eight months' old baby by her side. During the afternoon at about 3:30 o'clock, when she was between a mile and one-half mile north of the town of Provencal, her car was wrecked and she was severely injured. The question as to who caused this wreck is the controversy involved in this suit. Her version of how the accident occurred is found in the testimony and is as follows:

"Q. Are you the plaintiff in this suit against Joseph B. Elam? A. Yes.

"Q. You have alleged a certain accident in that suit. I wish you would describe where you had started to on that date, where you were going, how you were traveling and what occurred, in a brief manner. Giving the substance of things that may have some bearing upon this case? A. I was driving toward Provencal, about a mile from Provencal.

"Q. How fast were you traveling? A. About twenty-five (25) miles an hour. Not any more than twenty-five (25) miles an hour, when I saw a car coming at a very rapid speed and driving in a reckless and careless manner, raising lots of dust. I pulled to my righthand side of the road, in the ruts of the righthand side. When they came closer I could tell there were three men in the car and it was a Dodge coupe, and no one seemed to try to stop but me and I pulled as far as I could to the right side without going into the ditch.

"Q. Without what? A. Without going in the ditch on the righthand side. And when they got still closer they still stayed in the ruts that I was in. My two left wheels was in the same ruts with their two left wheels. They cut out just before they got to me and then cut back in again and hit the left back portion of my car and threw me back. I didn't go out of the car but I pushed my baby, who was laying down on the seat by me and who was eight months old, I pushed him off on to the floor to keep him from getting killed because I thought I was going to be turned over or be cut up. From that time I didn't know anything more.

"Q. How long before you did know anything, have you any idea? A. When I got to the sanitarium on the operating table."

The road on which the accident occurred runs approximately north and south. Just a few minutes before the accident a Mrs. Ernest Bell and her sister, Miss Dale Dowden, drove in a school children's truck a few hundred yards north of Provencal to the home of a Mrs. Hawthorne, who lives a few yards off the road on the west side. They evidently went on a very short errand. Just as they were getting in the truck to return to Provencal, they saw three men passing in a Dodge coupé, going north. When they were approaching a little bridge that crosses over to the main highway, they obeyed the law, stopped, looked, and listened to see if it was safe to enter the highway. They looked first to the south toward Provencal, and then to the north toward Robeline. Just as they looked to the north they saw plaintiff's car leave the road on the east side and wreck, a distance of 565 yards north of the bridge. At that instant they saw no other car colliding with or passing plaintiff, but bear in mind just a few seconds before, while they were in the act of starting the truck, they had seen a Dodge coupé pass with three men in it. They hurried to town as fast as they could and gave the alarm. In less time then it takes to tell it, large numbers of people rushed to the scene of the accident and rescued the plaintiff and her baby from the wreckage of the car. It developed that her car had crossed the road and had been wrecked on the east or opposite side from where she had been driving. But, tracing the tracks of her car, it was found that it started across the road from sixty feet or more north of where it was stopped by a stump. The hub cap was missing from the left rear wheel and was found in the graveled rut right at the point where it was clear that her car began to swerve east across the road. This hub cap was plainly dented. It could not have been knocked off by the stump, for it was in the wrong place for that. The dent shows that it was made by a metal substance, which must have been some part of a car, most likely a bumper.

Pat Dwyer, city marshal of Natchitoches, was among the first on the scene. The plaintiff says that she never regained consciousness until she reached the sanitarium at Natchitoches. But before those left the scene of the accident who conveyed her to the sanitarium, either in a lucid moment or in her delirium, she told Dwyer that a Dodge car with three men in it collided with her car and caused it to leave the road. As soon as she regained consciousness in the sanitarium, she was clear in her mind that it was a

Dodge coupé with three men in it that collided with her. In view of the fact that she said in her first lucid moment or in her delirium that a Dodge car with three men in it collided with her, and caused the wreck, and in view of the fact that as soon as she completely regained consciousness she remembered it the same way, and still remembered it so at the time of the trial, I think the conclusion is irresistible that the cause of the accident was in fact a collision with a Dodge coupé with three men in it. She made these declarations before she knew and before there was opportunity for her to know that there were witnesses in Provencal who saw the defendant's son and his two companions drive north from Provencal in a Dodge coupé just in time to collide with her at the spot where her car was wrecked. That circumstance alone speaks louder in her behalf than a living witness could possibly do. There are three kinds of testimony that cannot in the very nature of things be accurate, and they are estimates of time elapsed, distance traversed, and rate of speed. For instance: Mrs. Bell testified that it was about five minutes from the time she saw the car with the three men in it pass in front of Mrs. Hawthorne's house until she and her sister, Miss Dowden, were at the bridge looking north and witnessing the end of the wreck. The judge of the lower court very correctly said:

"We hardly think it had been anything like that long."

In my opinion, I doubt that it was as long as one minute. The important thing is that she and her sister saw the car with three men in it pass, and in practically the next instant saw the end of the wreck, after having looked in the opposite direction. Again: Pat Dwyer testified that he saw Mrs. Bell and her sister leave Provencal on their way to Mrs. Hawthorne's a few hundred yards north, and that the Dodge car with three men in it left just "a minute or two afterwards." He is mistaken in this, for it must have been some ten or fifteen minutes, for Mrs. Bell had time to go to Mrs. Hawthorne's, get out, and then come back to the truck and get it started to go back to Provencal. The important thing is the sequence of their leaving Provencal—that the car and three men left *after*, and *not before*, Mrs. Bell and her sister. As soon as possible after the accident, one of the men at the scene hurried to Provencal and telephoned in different directions to stop a Dodge coupé with three men in it. Lawrence Fox, the town marshal at Robeline, a distance of eleven miles to the north, received the message and immediately rushed out to the street to apprehend the car if it should come that way. As he did so he observed a car of the identical description given him passing through the town, but by a side street. He remained in the street for an hour and no other such car came along.

He naturally considered that that was the car wanted, and I think the evidence is conclusive to the effect that it was.. It is true that all three occupants of the car deny having gone through the town of Robeline by that route. It could easily be that the two occupants other than the driver never noticed that a turn from the main highway was made in the town. In the course of fast driving this would not necessarily be noticed and remembered by them. But with the driver it is different. If he was conscious of having hit plaintiff's car and was trying to make a quick getaway, that would have been the natural course for him to pursue and he would just as easily deny it.

It is a significant fact that all three occupants of the car distinctly remember and testify that they met the plaintiff, but that it was at a point about one mile further up the road than was the scene of the accident. The Dodge coupé and its three occupants were finally stopped at Mansfield, over an hour later. They all three professed absolute ignorance of having struck any car anywhere, and yet they could remember the exact spot where they met the plaintiff in her car. They remembered well that this spot was between one and one-half and two miles north of Provencal. Their testimony is unanimous that each car was well on its own right-hand side of the road, and that there was a distance of several feet between them when they passed each other and that, therefore, there could not have been a collision. Senator Huson, one of the occupants of the car, testified that he thought they passed several cars between Provencal and Coldwater, a distance of just a few miles; but it is rather remarkable that he remembers only one and that is the plaintiff's. He even remembered that it was a new car. He said he would never have remembered meeting her if meeting her had not caused him to make a remark to the driver, in his well-known capacity of a "back-seat driver." He says he was warning the boy all during the day on account of various things. He testified particularly that the plaintiff did not pull out of the road to the right suddenly as she was already there. This corroborates her testimony that she was driving on her right side at all times and destroys the effect of any possible warning remark that he remembers having made to the driver of the car, unless that remark was a warning to him to get off the left side of the road as there was danger of a collision.

The plaintiff is therefore corroborated by the three occupants of the car in her testimony that she met them. The only difference between her testimony and that of these three is in the place of meeting and the fact of a collision. It is evident that the collision took place just as the car had almost succeeded in passing. Without enumerating it, there is ample testimony to the effect that the collision took place at a place where loose gravel

was deep and that the tracks of the plaintiff's car showed plainly that she was well on her right side for quite a distance before the collision. This same testimony shows that the colliding car was traveling for some distance on the wrong side of the road and that just before the collision there was an unsuccessful effort to pull over to the right, out of the deep ruts in the loose gravel. These ruts run right up to the point where the dented hub cap was found. It is quite evident that the rear portion of defendant's car, most likely the bumper, struck plaintiff's car, tore off the hub cap, and caused the car to veer or swerve to the left. This kind of collision could have occurred easily without the knowledge of the two occupants other than the driver, and might have happened even without his knowledge. But that fact did not relieve the driver of liability for his negligence in driving on the wrong side of the road and failing to get over to the right side in time to avoid a collision.

Now, since plaintiff said immediately after the accident, as she did, that the accident was caused by a Dodge car with three men in it, and since these same three men in a Dodge car were seen to leave Provencal just a few minutes before the accident, just about long enough to reach that spot, I think such a strong presumption of guilt is raised against the driver of the car that it cannot be repelled by a simple denial on his part. In his written opinion the judge of the lower court says that he does not think anything like five minutes elapsed between the time when Mrs. Bell and her sister saw these three men in a Dodge car pass north and the time when they saw plaintiff's car leave the road and hit the stump. He is right in this conclusion. But at the same time he argues that, while these ladies were traveling just a few yards to the road, these three men in the Dodge car were bound to have been far beyond the scene of the accident and out of sight and, therefore, could not have been the ones that caused the collision. Well, if they were not the ones, then absolutely and beyond question there must of necessity have been another car passed after they did. But this is not true. No other car passed that way. If it had these ladies would have seen it, but they saw no other. That was the last car. All the witnesses in Provencal corroborate these ladies in saying that no car left there after the Dodge car and before the accident, but the court argues that since these ladies did not see the Dodge car collide with plaintiff, it was not and could not have been that car. By the same process of reasoning it would have to be held that no car at all collided with the plaintiff just because these ladies did not see it. It is not remarkable that these ladies did not see the other car which collided with plaintiff. It must be borne in mind that they were not looking north at the instant of the collision, but were looking south. When they turned to look

north and saw the car leaving the road on the west or opposite side of the road, the actual collision had already occurred some fifty or more feet further up the road and the other car was obscured by the dust that must have been raised and had disappeared around the curve that is just beyond the point of actual collision.

As intimated above, the contact between the cars may not have been noticed by all occupants of the Dodge car. If it was not, there was nothing to call the meeting so clearly to the minds of these people that they could fix the exact location, particularly since they remember that each was well on its own right side of the road.

Many a man has been hanged on circumstantial evidence much weaker than we have in this case. It is proved that plaintiff was injured by a Dodge car with three men in it. Those three men admit seeing and meeting the plaintiff, but to establish an alibi, fix the point of meeting nearly a mile from the point of collision. But it is proved that they passed along the road at a time that would place them at the exact scene of the accident. Two ladies saw them going toward the scene and then, in less time than is necessary to relate it, they saw the plaintiff's car leave the road. No one else left Provencal after they did. It could not have been caused by a car leaving ahead of them. According to their own admission they were very close in point of time and distance. They were the only ones that could have caused it, and in my opinion they did cause it. It is sought by the defense to show that the traffic on this highway was very heavy at that time and that, therefore, it could have been some other car. Senator Huson says he thinks they passed a number of cars, and if the traffic was heavy he would have passed several others, but, mirabile dictu, he remembered only plaintiff in all that distance, both as to the exact spot in the road and the relative positions on each side of the road. In his written opinion, which has been adopted as the majority opinion of this court, the trial judge says:

"The plaintiff in this case was undoubtedly badly hurt, and there are very grave suspicions pointing to the Elam car as the cause of the accident, but we do not consider same strong enough to fix liability on it."

Indeed, the suspicions are great, so great in my opinion that the conclusion is irresistible that this Elam car did collide with plaintiff's car and cause her injury. I believe the testimony of Lawrence Fox, marshal of Robeline, is true. He says he saw a car of the description of the Elam car going through the town over a much-used street, but not the main highway. Why did the driver choose this route and then deny it? That testimony is, in my opinion, exceedingly important. The lower court doubted its truthfulness and correctness. It is easy to gather from its opin-

ion that if this testimony had been credited the decision might have been different. On the day of the trial plaintiff learned of other witnesses who would testify positively and would corroborate the testimony of Fox to the effect that a Dodge car with three men in it did not proceed through the town of Robeline by the most direct route, but that it went by another route. Application for a reopening of the case to take the testimony of these witnesses was refused. It is my opinion that, under the circumstances and in view of the written affidavits of the newly discovered witnesses, the case should have been reopened and continued to give plaintiff opportunity to produce this testimony.

The trial court appears to doubt the testimony of Pat Dwyer, town marshal of Natchitoches, when he says that plaintiff told him that a Dodge car with three men in it hit her, for two reasons, viz.: (1) That Mrs. Fisher says she was unconscious until she reached the sanitarium in Natchitoches, and (2) that no one else heard her statement. The answer to these objections is simple. The lady could have, and probably did, make the statement either in a short lucid interval which she did not remember, or in her delirium. In either case the testimony would be extremely important and valuable and convincing. As to no one having heard her, there was excitement everywhere. Mr. Dwyer elicited the statement by his own questions. He was an officer of the law seeking for evidence, and in addition he took personal charge of the plaintiff and her baby and carried them in his car to the sanitarium at Natchitoches. He had greater opportunity to hear the testimony than any one else and, furthermore, no possible motive can be suggested as to why he should testify to an incorrect statement of facts. He can have no personal interest in the case. So far as the record shows he never saw or heard of the plaintiff before the accident.

Much is made of the fact that no visible marks or dents were found on defendant's car to evidence a collision. The metal of a bumper is of such a nature that it might easily dent a hub cap without any mark or sign being left on it. As it appears to me, the bumper of defendant's car evidently caught the plaintiff's rear left hub cap and caused the car to swerve and wreck. There was no engagement or entanglement between the cars, so defendant had no trouble in proceeding. Plaintiff's car was swerved and defendant's went on its way. To try to decide whether the hub cap was struck by the top or bottom of the bolt in the end of the bumper would be absolutely useless. The measurement of the height of the bumper or wheel would profit nothing. The varying depths of the tracks in the loose gravel prohibit absolutely any accurate estimate of this kind.

Since the plaintiff's demand is rejected by the majority opinion, it would be useless to discuss the quantum of damages. In my opinion the case should be reopened and opportunity given the plaintiff to introduce her newly discovered evidence on a most important point.

For the reasons assigned, I respectfully dissent.